IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                            CRIMINAL ACTION NO. 2:17-cr-00125

ANTOINE E. SKAFF,

          Defendant.

## MEMORANDUM OPINION AND ORDER

### I. Background

      Dr. Antoine Skaff used the privilege of a dental license to engage in thousands of individual acts of fraud charged by the United States as one fraudulent scheme. This case began in 2015 when an unnamed individual filed a complaint with the United States Drug Enforcement Agency ("DEA") reporting that a high volume of patients were only briefly visiting Dr. Skaff's dental office. In late 2015, the DEA referred the investigation to the West Virginia Board of Dental Examiners. During the investigation, the West Virginia Board of Dentistry received credible information that Dr. Skaff was improperly billing Medicaid based on an audit by Scion Dental, a provider network and administrator of the Medicaid dental benefits for the Managed Care Organizations ("MCOs") under contract with West Virginia Medicaid. The West Virginia Board of Dentistry continued investigating Dr. Skaff based on this

information. On July 20, 2017, Dr. Skaff entered into a Consent Decree and Order with the West Virginia Board of Dentistry, agreeing to a reprimand for his inappropriate opioid-prescribing practices and his fraudulent billing practices, and to a suspension of his license to practice dentistry, among other conditions.

The charges before me are the result of further investigation of Dr. Skaff, jointly conducted by the United States Department of Health and Human Services/Office of the Inspector General, the DEA, the West Virginia Medicaid Fraud Control Unit, and the West Virginia Department of Health and Human Resources Bureau of Medical Services (on behalf of West Virginia Medicaid). This further investigation revealed that by August 31, 2016, Dr. Skaff had been engaged in an extensive fraudulent billing scheme for at least five and a half years. Dr. Skaff executed this scheme in two different ways. First, he engaged in "upcoding." Second, he engaged in "double billing." Between these two schemes, Dr. Skaff executed at least 7,836 individual acts of criminal fraud against Medicaid.

On July 17, 2017, the United States Attorney filed a single-count information against Dr. Skaff for health care fraud, in violation of 18 U.S.C. § 1347. Information [ECF No. 1]. On August 21, 2017, Dr. Skaff pleaded guilty to the information. Written Plea of Guilty [ECF No. 9]. At the December 7, 2017 sentencing hearing, I sentenced Dr. Skaff to sixty (60) months' imprisonment followed by three (3) years' supervised release. I articulate my reasons for imposing this sentence below.

## II. The Advisory Guideline Range

In imposing sentence, a district court "must treat the [United States Sentencing] Guidelines [("Guidelines")] as the starting point and the initial benchmark." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotation marks omitted). Then, it must consider the sentencing factors set forth in 18 U.S.C. § 3553(a). I will begin by calculating the advisory Guideline range in this case.

Dr. Skaff pleaded guilty to violating 18 U.S.C. § 1347. Since violations of that statute carry a statutory maximum penalty of ten (10) years' imprisonment, section 2B1.1(a)(2) of the Guidelines provides for a base offense level of 6.

Several specific offense characteristics call for upward adjustments to Dr. Skaff's offense level. First, section 3B1.3 of the Guidelines mandates a two-level increase if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The Fourth Circuit recognizes that medical providers, such as Dr. Skaff, are in a position of trust due to their relationship to Medicaid and its MCOs. *United States v. Bolden*, 325 F.3d 471, 505 (4th Cir. 2003). The parties agree that this enhancement applies. Plea Agreement 5 [ECF No. 10]. Therefore, I **FIND** that the section 3B1.3 enhancement applies, raising the offense level to 8.

Second, section 3C1.1 of the Guidelines mandates a two-level increase if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and . . . the obstructive conduct related to . . . the

defendant's offense of conviction and any relevant conduct." Dr. Skaff altered patient charts in an attempt to conceal his double billing scheme from Scion Dental, which performed the audit of Dr. Skaff's Medicaid billings. Plea Agreement, Ex. B at 5. On account of that behavior, the parties agree that this enhancement applies. Plea Agreement 5. Neither party objects to the application of this enhancement in the presentence report. Therefore, I **FIND** that the section 3C1.1 enhancement applies, raising the offense level to 10.

Third, section 2B1.1 of the Guidelines requires an enhancement based on the amount of "loss" caused by the defendant's fraudulent conduct. For the purposes of section 2B1.1, loss is defined as the greater of actual loss or intended loss. U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A) (U.S. Sentencing Comm'n 2016) [hereinafter "U.S.S.G."]. Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). Intended loss means "the pecuniary harm that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

> In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima face evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.

U.S.S.G. § 2B1.1 cmt. n.3(F)(viii). Finally, loss is reduced by "the fair market value of . . . the services rendered, by the defendant . . . , to the victim before the offense

was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i); *see United States v. Miller*, 316 F.3d 495, 499 (4th Cir. 2003) ("[W]hen determining losses for sentencing purposes, a court must subtract the amount of money or benefits to which a defendant is legitimately entitled from the amount fraudulently claimed.").

In this case, Dr. Skaff fraudulently *billed* Medicaid a total of $1,443,570 and was fraudulently *paid* by Medicaid a total of $1,391,207. Dr. Skaff was legitimately entitled to $656,130 for the services he actually rendered. This results in an intended loss of $787,440 and an actual loss of $735,077. *See Miller*, 316 F.3d at 504–05 (acknowledging "the common inference that the amount billed is the amount that is intended to be paid" and rejecting the defendant's argument that intended loss should be based on the amount paid, not the amount billed). I **FIND** that the loss caused by the defendant's conduct for purposes of calculating specific offense characteristics to be $787,440. Under section 2B1.1(b)(1)(H), loss of more than $550,000 but less than $1,500,000 mandates a fourteen-level enhancement. Therefore, Dr. Skaff's offense level rises to 24.

Section 3E1.1(a) of the Guidelines mandates a two-level decrease if a defendant "clearly demonstrates acceptance of responsibility for his offense." However, "[c]onduct resulting in an enhancement under [section] 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both [sections] 3C1.1 and 3E1.1 *may* apply." U.S.S.G. § 3E1.1 cmt. n.4. (emphasis added). In the Fourth Circuit, "the

question of whether a defendant who obstructed justice is entitled to an acceptance-of-responsibility reduction [is] a largely factual matter to be determined by the district court." *United States v. Knight*, 606 F.3d 171, 176 (4th Cir. 2010).

Here, Dr. Skaff's obstruction was relatively simple: during the investigation, he retroactively altered patients' charts in an attempt to hide his double billings from Scion Dental. There is a stipulation of facts wherein Dr. Skaff admits to this obstruction.

At the sentencing hearing, the government stated that Dr. Skaff pleaded guilty to his offense of health care fraud only a month after the execution of a federal search warrant of his dental office. The government noted that this guilty plea resolved the criminal investigation of Dr. Skaff's fraudulent billing practices much more quickly than the average health care fraud case. The defendant also argued that he entered into a substantial civil settlement with the government and promptly paid a sum of $2,205,231. This sum provides full restitution to West Virginia Medicaid for its loss and double that amount to the United States as punishment. Therefore, I **FIND** that this case presents extraordinary circumstances for granting acceptance of responsibility. I grant the two-level reduction for acceptance of responsibility. At the sentencing hearing, the government moved for the additional one-level reduction under section 3E1.1(b), which I granted.

Therefore, Dr. Skaff's total offense level is 21. Dr. Skaff has no criminal history, establishing a Criminal History Category of I. Given a total offense level of 21 and a Criminal History Category of I, the advisory Guidelines range is as follows: a term of

imprisonment of thirty-seven (37) to forty-six (46) months; a term of supervised release up to three (3) years; a fine of $15,000 to $1,470,154 (twice the pecuniary loss resulting from the defendant's conduct); restitution; and a $100 special assessment.

## III. Statement of Reasons

Congress has identified four "purposes" of sentencing: just punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guideline range, but also the facts of the specific case through the lens of seven factors. 18 U.S.C. §§ 3553(a)(1)–(7).

### A. The Nature and Circumstances of the Offense

Describing Dr. Skaff's criminal behavior in this case as *the* offense is legally correct but misleading. In actuality, Dr. Skaff's habitual criminal behavior encompassed *at least* 7,836 individual and deliberate acts of fraudulent billing to Medicaid over the course of more than five and a half years. To put this number in perspective, consider that between January 1, 2011 and August 31, 2016, there were a total of 2,068 days, including weekends and holidays. This means that on average, assuming Dr. Skaff worked every day of the year, he was billing Medicaid for nearly four fraudulent transactions *per day*, for at least five and a half years. Moreover, each of Dr. Skaff's individual criminal exploits were contrived—i.e., not the spontaneous or natural consequence of a prior misdeed.

Beyond the sheer volume of criminal acts that Dr. Skaff committed, the nature of each fraudulent transaction is blameworthy. Dr. Skaff had two distinct schemes

for defrauding Medicaid. The majority of his fraudulent billings (7,490 of 7,836) were upcodings on tooth extractions. For this part of the scheme, when Dr. Skaff performed a simple tooth extraction on a patient, he represented in his claim to Medicaid that he performed a complex tooth extraction, usually an impacted tooth extraction. Medicaid pays more for impacted tooth extractions because they are more involved than simple extractions. Based on Medicaid's reimbursement rates, on each of these occasions, Dr. Skaff received between $92 and $105 more than he deserved for the extraction actually performed. The remaining 346 fraudulent claims constituted double billing. In those claims, by altering the location and/or date of service, Dr. Skaff billed Medicaid for a tooth extraction for which he had already been paid by Medicaid. Dr. Skaff received between $172 and $205 more than he deserved in each of those instances because he was paid twice for a procedure he performed once.

In sum, Dr. Skaff engaged in a habitual pattern. He committed fraud crimes several times per day for well over five years for one reason—personal greed.

## B. The History and Characteristics of the Defendant

Born in Beirut, Dr. Skaff came to the Western Hemisphere from war-torn Lebanon as a teenager, having lost family and having been subject to an environment of violence and deprivation. By dint of hard work and considerable ability, he became well-educated in engineering and subsequently as a doctor of dentistry. He married an accomplished woman who became a physician, and together, they have raised a family of four bright and well-educated children. The children report that their father was an exemplary role model for them in striving for success in their chosen career

paths. Dr. Skaff is a respected member of his church and community. Many of his fellow church members have written to me, praising his character.

Several of Dr. Skaff's patients have also written to me, praising his practice as a dentist. For example, patient John Hale describes Dr. Skaff as "a skilled professional who is my Dentist" and "a friend who is very kind and has a genuine concern for each individual member of my family and for me." Def.'s Sentencing Mem. 8 [ECF No. 23]. Other of Dr. Skaff's patients have expressed similar satisfaction with his work as a dentist. One patient mentioned that she had "dental anxiety" over finding a new dentist in Charleston. Upon interacting with Dr. Skaff, she reported that the anxiety quickly subsided. That is the Dr. Skaff known to his fellow West Virginians.

However, the duality of certain individuals is rarely more apparent than in this case. As Paul Harvey used to say "the rest of the story" is where this case gets interesting and where I must find the facts that I need to fashion an appropriate sentence.

Dr. Skaff's conviction stems from a scheme of fraudulent billings to Medicaid for tooth extractions. These extractions were intimately connected with Dr. Skaff's opioid-prescribing practices. A sentence which focuses solely on the harm caused by the Medicaid fraud in dollar amounts ignores the fact that this fraud was perpetuated in the context of a reckless and harmful pattern of opioid-prescribing practices, as well as many other harmful practices. *See* Anthony Kyriakakis, *The Missing Victims of Health Care Fraud*, 2015 Utah L. Rev. 605, 646.

The presentence report, prepared by the probation officer of this court after an in-depth investigation, reveals that Dr. Skaff is a serial criminal. During the course of investigations into his suspicious prescription practices, Dr. Skaff admitted remarkably to a DEA agent that he disbursed painkillers to people he knew did not visit him for his capabilities as a dentist. Dr. Skaff knew their reason for visiting him was to have teeth pulled so that they could acquire a prescription for opioid pills. Dr. Skaff acknowledged that he nonetheless fueled his clients' addiction because, if he did not do so, he would not be able to make the money he felt he was entitled to make.

The correlating statistics to this admission are equally astounding. The DEA reported that from January 1, 2015 through August 1, 2015, Dr. Skaff issued 1,143 prescriptions for hydrocodone, usually 5 mg or 7.5 mg pills, ten pills at a time. In other words, Dr. Skaff prescribed over 10,000 opioid pills in a seven-month span. Further investigation into Dr. Skaff's prescribing practices revealed that certain individual patients were receiving suspiciously large numbers of prescriptions. For example, Daniel E. Becker, DDS,[1] concluded that eleven patients received a total of 192 prescriptions for ten pills each (1,920 pills). Dr. Skaff's ten most heavily prescribed patients received between eight and twenty-four opioid pill prescriptions for the period from 2014 through August 1, 2015. During that same time, two of Dr. Skaff's patients overdosed (non-fatally) on hydrocodone. One patient had received fifteen hydrocodone prescriptions from Dr. Skaff and the other had received seven prescriptions. While these overdoses occurred three and four months after the

---

[1] Dr. Becker reviewed a sample of Dr. Skaff's patient records and West Virginia Board of Pharmacy records to provide an opinion on Dr. Skaff's prescribing methods.

patients had last seen Dr. Skaff, it is further evidence of his reckless prescribing practices in a state ravaged by opioids.

Not only was Dr. Skaff willing to exacerbate the foremost public health concern in this state by issuing painkillers to known addicts, but he also was willing to harm the dental health of his patients in the process. Dr. Skaff acknowledged that he excised healthy teeth from low-income individuals in order to conceal the true purpose of their visit: to obtain opioid painkillers.

He also prolonged his destructive role in the lives of his patients by excising teeth in successive appointments. Each appointment afforded him the opportunity to pull another tooth, and each extraction provided the pretext for another prescription for opioids. For one patient, identified as B.W. in the patient records reviewed by Dr. Becker, Dr. Skaff extracted twenty-six teeth in twenty-eight treatment sessions within a five-month window. In these five months, B.W. received prescriptions for a total of 260 opioid pain pills. Dr. Skaff profited from the addiction of his low-income clients—an addiction he recklessly, and sometimes knowingly, augmented.

The DEA investigation revealed that Dr. Skaff had recently taken a course regarding drug diversion practices for medical professionals. He even acknowledged to the DEA agent that he understood the concept of drug diversion and that opiate addiction was rampant in West Virginia. Yet, in the same breath, he complained to the DEA agent that if he turned away drug-seeking patients, it would harm his business and his financial interests.

His lack of decency is further apparent based on the manner in which he ran

his practice. Evidence shows that Dr. Skaff would administer nitrous oxide to his patients and then leave the room. Dr. Skaff always worked alone, so the patient would remain unattended while inhaling the nitrous oxide. Unsupervised and deprived of an appropriate balance of oxygen, these patients were, by Dr. Skaff's own admission, sometimes unresponsive when Dr. Skaff returned. Dr. Skaff did not correct his methods to avoid this. Instead, Dr. Skaff slapped these patients back into full consciousness.

Additionally, Dr. Skaff did not have X-ray holders to avoid exposing his patients to unnecessary radiation while taking X-rays. He had exactly one employee, a secretary, whose sole responsibility was to make appointments. Dr. Skaff deliberately limited her from working more than thirty-six hours per week so that he could avoid providing her with a pension plan.

In sum, Dr. Skaff profited by operating unnecessarily on drug-seeking patients in order to prescribe opioids to addicts in a manner that, Dr. Becker reports, has been admonished by dental educators. He disregarded even the most basic of safety methods and shirked his responsibility as a licensed professional authorized with prescriptive authority. His conduct is consistent with his belief that he is entitled to more money and an absence of any remorse for what he was doing to his patients or the public at large.

Dr. Skaff's crime of conviction is one count of Medicaid fraud. In fact, his criminal conduct consisted of operating his dental practice as a criminal enterprise for at least five and a half years. His unitary conviction encompasses over 7,000

separate and complete crimes for fraudulent billing. However, it entirely ignores the fact that, simultaneously, Dr. Skaff was pulling the teeth of poor individuals to satisfy their drug addiction under the guise of a legal prescription. Dr. Skaff's white coat does not blind this court to the true nature of his conduct.

### C. The Need for the Sentence Imposed

*1. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

Dr. Skaff's habitual behavior of billing Medicaid fraudulently is serious criminal conduct. This is not one mistake in judgment as the Guidelines and the defendant would have us believe. *See* Def.'s Sentencing Mem. 1 ("No man should be judged solely by the worst episode of his life.")

The Guidelines evaluate fraud cases based on the amount of loss caused by the criminal conduct, an easily quantifiable and uniform trait across the wide variety of fraud offenses that have been executed and are possible. But this overemphasizes the harm caused by a defendant's criminal conduct and underemphasizes the culpability of the defendant. This phenomenon in the Guidelines is well known. *See* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 69 (2003) ("Harm-based adjustments can increase a sentence from offense level six to forty-three . . . . Culpability-based adjustments, on the other hand, rarely contribute more than two to four levels . . . ."); Aaron J. Rappaport, *Rationalizing the Commission: The Philosophical Premises of the U.S. Sentencing Guidelines*, 52 Emory L.J. 557, 611 (2003) ("For the most common Chapter Two rules—economic and drug offenses—

mens rea has only a limited role."). For this reason, I disagree with the Guidelines on policy grounds in certain fraud cases such as this.

One way to see this overemphasis on harm and underemphasis on culpability is to consider Dr. Skaff's conduct more closely in relation to the Guidelines loss table in section 2B1.1(b). Dr. Skaff's loss calculation mandated a fourteen-level increase to his total offense level because his intended loss amounted to $787,440. However, the loss table does not take into account that this harm accumulated over thousands of individual acts of criminal fraud. Thus, someone who overbills Medicaid for $787,440 on one occasion would be sentenced the same under the Guidelines as someone like Dr. Skaff, who wrongfully billed Medicaid thousands of times.

In general, just punishment for habitual criminal conduct is not well accounted for by the Guidelines. The overemphasis on harm and underemphasis on culpability produces a Guideline range that does not reflect the seriousness of the repeated formation of criminal intent followed by the repeated execution of the actus reus. For example, had Dr. Skaff undeservedly received $2 per fraudulent transaction, the loss would only have been $15,672, calling for a mere four-level enhancement by the Guidelines loss table. Yet, the number of individual fraudulent acts would still be 7,836. The monetary harm would be but a small fraction of $787,440, and still, the culpability would be exactly the same. Dr. Skaff intended to commit and executed thousands of individual acts of fraud, and the seriousness of this conduct is not captured by the Guideline range.

The Guidelines' aggregation rules, coupled with its overemphasis on harm, provide a significant maximum penalty discount for those engaged in fraud schemes that are comprised of many individual acts of fraud. For example, a defendant who commits 7,836 separate acts of fraud could be charged and convicted on each instance of criminal behavior. While the Guideline range does not change based on charging decisions because of the aggregation rules, the maximum penalty certainly does. Dr. Skaff was charged with only one count of fraud even though he committed 7,836 individual acts of fraud. He is subject to a statutory maximum of ten years for that single count. Had he been charged with each of his fraud crimes, he would have been subject to a maximum penalty many centuries long.

I **FIND** that the seriousness of Dr. Skaff's criminal conduct warrants a substantial prison sentence to promote respect for the law and just punishment.

### 2. To afford adequate deterrence to criminal conduct

White collar crimes are not victimless. "Fiscally, Medicaid fraud drains valuable state and federal resources that are often desperately needed elsewhere." John R. Munich, *The Medicaid Anti-Fraud Amendments of 1994: Attorney General's Newest Weapon in the Fight Against White Collar Crime*, 52 J. Mo. B. 26, 26 (1996). "[I]t is estimated that such fraud accounts for up to 10 percent of all health care expenditures." *Id.; see The $272 Billion Swindle: Why Thieves Love America's Health-Care System*, Economist (May 31, 2014), https://www.economist.com/news/united-states/21603078-why-thieves-love-americas-health-care-system-272-billion-swindle.

Beyond monetary harms, Medicaid fraud also results in the "degradation and devaluation of human beings to some sort of subhuman chattel." Munich, *supra*, at 26. As one commentator has noted, "a judge's assessments of a health care fraud offender's culpability is compromised when she lacks awareness that an offender *knowingly* or *recklessly* exposed patients to harm or risks of harm in furtherance of a fraudulent scheme." Kyriakakis, *supra*, at 646. "When we fail to identify and recognize the patients whose health and well-being are threatened by acts of health care fraud, we devalue those patient-victims and skew the punishments of the offenders who exploit patients as a means to enrich themselves." *Id.* at 656.

I **FIND** that a substantial prison sentence is necessary to provide deterrence not only to Dr. Skaff but also to those who might be inclined to engage in similar criminal conduct. Health care fraud is an enormous problem in this country.

### 3. To protect the public from further crimes of the defendant

As I have articulated, Dr. Skaff's habitual behavior went on for many years. I recognize that he has agreed, as part of his civil settlement with the government, to be excluded from all federal medical programs for thirteen years. Def.'s Sentencing Mem. 10. Nevertheless, I **FIND** that a substantial prison sentence is necessary to protect the public from Dr. Skaff.

*4. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

I acknowledge that Dr. Skaff is not in need of rehabilitation services generally offered by the Bureau of Prisons. I **FIND** that there is no readily available educational or vocational training that would be effective in this case.

### D. The Kinds of Sentences Available

I have considered the kinds of sentences available for this offense.

### E. The Need to Avoid Unwarranted Sentence Disparities

In his sentencing memorandum, Dr. Skaff provided information regarding several recent white collar cases involving medical fraud to argue that a Guideline sentence of thirty-seven (37) to forty-six (46) months would be disproportionate in this case. Def.'s Sentencing Mem. 11–13. Dr. Skaff, however, does not specifically address how such a Guideline sentence would cause an *unwarranted* disparity. Courts are not supposed to forge cookie cutter sentences to apply to defendants who act under different circumstances with different surrounding facts. The criminal conduct in this case is a fraudulent scheme of extensive duration wherein Dr. Skaff formed criminal intent at least half a dozen times per day. Moreover, Dr. Skaff's professional conduct, of which the extensive Medicaid fraud is just a part, reveals much significant and troubling information.

### F. The Need to Provide Restitution to the Victim(s) of the Offense

West Virginia Medicaid, the victim of Dr. Skaff's fraudulent conduct, suffered a loss of $735,077. Medicaid provides health and dental coverage for low-income

individuals—individuals who otherwise would not be able to afford coverage or receive necessary medical and dental services. It is imperative that West Virginia Medicaid be made whole in its losses due to Dr. Skaff's fraudulent conduct so that it can direct those funds to their proper purpose.

## IV. Conclusion

In summary, Dr. Skaff accomplished his rapacious scheme of fraud through 7,836 fraudulent billings to Medicaid. The majority of his fraudulent billings were upcodings on tooth extractions, wherein Dr. Skaff claimed compensation from Medicaid for a complex tooth extraction when he actually performed a simple tooth extraction. On other occasions, Dr. Skaff simply double billed by altering the locations or dates on prior claims and then resubmitting them to Medicaid. Dr. Skaff is dismissive of the true culpability of his actions. He minimizes his blameworthiness for his prescribing practices by using his own financial gain to justify knowingly and recklessly prescribing opioid pain pills to drug addicts and to justify knowingly pulling healthy teeth from drug addicts. He further minimizes his blameworthiness by trying to filter 7,836 separate acts of fraud into a single episode, challenging the fairness of the system he defrauded by arguing that he deserved more for performing simple extractions on low-income individuals.

Having considered the 3553(a) factors, I **FIND** that a sentence of sixty (60) months' imprisonment followed by three (3) years' supervised release is sufficient, but no more than necessary, to serve the ends of justice. This sentence is higher than the Guideline range because I have policy disagreements with the Guideline range in

this case. An above-Guideline sentence is sufficient, but no more than necessary, to satisfy the provisions of 18 USC § 3553(a), to promote respect for the law, to protect the community, and to provide adequate deterrence.

At the sentencing hearing and in the accompanying Judgment Order, I imposed the standard conditions of supervised release in this district, and the special conditions recommended by the probation officer. I also imposed an additional, special condition that Dr. Skaff not be permitted to practice dentistry during his period of supervised release. Congress has granted the courts the authority to order, as a further condition of supervised release, any condition set forth as a discretionary condition of probation in § 3563(b) to the extent that such condition–

> (1) is reasonably related: to the nature and circumstances of the offense; to the history and characteristics of the defendant; to the need for the sentence to reflect deterrence, incapacitation, and rehabilitation;
> (2) involves no greater deprivation of liberty than is reasonably necessary for deterrence, incapacitation, and rehabilitation; and
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission.

18 U.S.C. § 3583(d). Section 3563(b)(5) allows a court to prohibit a defendant "from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense." The Guidelines state that such occupational restrictions may be imposed only if

> (1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction, and
> (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to

> engage in unlawful conduct similar to that for which the
> defendant was convicted.

U.S.S.G. § 5F1.5(a). The Senate Judiciary Committee Report makes clear that such a condition is not to be used as a means of punishment, but only as reasonably necessary to protect the public. *See* S. Rep. No. 98-225, at 96–97 (1983).

Based on the information I have previously discussed regarding Dr. Skaff's criminal conduct and lack of professionalism in his practice of dentistry, I **FIND** that prohibiting the defendant from practicing dentistry during his term of supervised release meets the statutory requirements and is no greater than necessary to protect the public from the defendant's engagement in similar unlawful conduct, namely fraudulent billing. *See also United States v. Cardine*, 192 Fed. App'x 241, 242 (4th Cir. 2006) (finding that forbidding employment in the industry in which the fraud occurred bears a reasonably direct relationship to the offense of conviction).

At the sentencing hearing, the parties indicated that on September 12, 2017, Dr. Skaff paid $2,205,231 as part of a settlement agreement in the related civil case with the United States and West Virginia Medicaid. Of this amount, $735,077 constitutes restitution to West Virginia Medicaid for the full amount of its loss. At the sentencing hearing, the government conceded that the remaining $1,470,154 is a punitive sanction. As a result of this payment, I **FIND** that Dr. Skaff has paid restitution in full, so no restitution is owed to West Virginia Medicaid. I also **FIND** that Dr. Skaff has paid a penalty in the amount of the statutory maximum fine, and I therefore impose no fine.

For the foregoing reasons, I **ORDER** the sentence imposed as stated in the accompanying Judgment Order and Statement of Reasons.

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     December 14, 2017

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE